```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
A. BROOKE CHRISTIAN,

                        Plaintiff,              17-cv-5554 (PKC)

            -against-                           OPINION
                                                AND ORDER

TRANSPERFECT GLOBAL, INC.,
TRANSPERFECT TRANSLATIONS
INTERNATIONAL, INC., PHILIP R. SHAWE,
and ELIZABETH ELTING,

                        Defendants.
-----------------------------------------------------------x
```

CASTEL, U.S.D.J.

    Plaintiff A. Brooke Christian worked as a senior officer of defendant TransPerfect Translations International, Inc. ("TPT"). TPT is a wholly-owned subsidiary of defendant TransPerfect Global, Inc. ("TPG"), a translation services provider. The First Amended Complaint ("Amended Complaint," Dkt. 54) alleges that defendants Philip R. Shawe and Elizabeth Elting, who are the co-Chief Executive Officers and sole directors of both TPT and TPG, as well as the principal shareholders of TPG, promised Christian a 10% equity stake in TPG or its cash equivalent in exchange for his performance of certain services at TPT. Christian now brings contract and quasi-contract claims based on that promise. Elting, on the one hand, and TPG and TPT, on the other, move to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. For the reasons that will be explained, the Court denies the motions.

BACKGROUND

    The Court draws the following facts from the Amended Complaint, the documents deemed to be a part of it, and matters of which the Court may take judicial notice.

New York Pet Welfare Ass'n v. City of New York, 850 F.3d 79, 86 (2d Cir.), cert. denied 138 S. Ct. 131 (2017). For the reasons to be explained, the Court declines the moving defendants' invitation to disregard certain factual allegations in the Amended Complaint that vary from the originally-filed complaint ("Original Complaint," (Dkt. 1)).

Christian worked as Executive Vice President of Global Sales & Marketing and Chief Sales Officer of TPT for twenty years, beginning in approximately 1996. (Am. Compl. ¶ 21). TPT is the wholly-owned subsidiary of TPG and is TPG's "main operating company." (Id. ¶ 12). Elting and Shawe are the co-CEOs and sole directors of both TPT and TPG, as well as the "principal shareholders" of TPG. (Id. ¶ 15). Though Elting and Shawe began TPG in a college dormitory, TPG expanded to operate a global network of thousands of translators, editors, and proofreaders proficient in over 100 languages. (Id. ¶¶ 16–17). TPG grew profitably for two decades, achieving nearly $80 million in net income in 2014. (Id. ¶ 20).

At TPT, Christian was responsible for its business strategies, including developing its most lucrative lines of business in legal services and life sciences. (Id. ¶ 21). He managed TPT's second largest office and supervised 500 employees worldwide. (Id.). TPT and Christian never entered into a written contract regarding his employment. (Id. ¶ 22). In the event he decided to leave TPT, Christian was not subject to any non-compete restrictions. (Id.).

In or about 2012, the relationship between Elting and Shawe began to deteriorate. (Id. ¶ 24). By 2014, each of Elting and Shawe retained counsel to represent them in disputes as TPT and TPG descended into deadlock. (Id.). In January 2014, at an annually-held meeting of the senior management of TPT and TPG, Elting and Shawe discussed with Christian the possibility of litigation between Elting and Shawe and its potential negative impact on TPT and TPG. (Id. ¶¶ 23, 25–27). Elting and Shawe further discussed with Christian the importance of

his "continued services in stabilizing and continuing to grow the company" in light of the discord. (Id. at 27). They then promised Christian a 10% equity stake in TPG, or its cash equivalent, "with equal contributions from Shawe and Elting as the company's two principal shareholders" within a matter of months. (Id.). They promised that there would be no sale, initial public offering, or other "significant transaction" involving the ownership of TPG or TPT unless and until Christian received the equity or cash. (Id. ¶ 28). Elting and Shawe promised that they would provide documents or an escrow account to support the promise within months. (Id.). Christian alleges that this was the most "recent[]" and specific[]" recitation of the promise, but that the promise was made "on multiple occasions" at prior such meetings. (Id. ¶ 23).

Because of the promise, Christian remained in his roles at TPT from the January 2014 meeting until October 2016. (Id. ¶ 30). He also took on additional management responsibilities during this period while Elting and Shawe "were consumed by litigation." (Id.). He ensured the retention of senior employees and major clients despite the public nature of the dispute between Elting and Shawe. (Id.). Christian alleges that, because of the promise, he did not seek additional compensation for performing additional duties at TPT. (Id. ¶ 31). He also alleges that the promise caused him to prioritize the company's well-being over his commissions and to forfeit an opportunity to "cash out of the . . . phantom stock program." (Id.).

At all times relevant to this action, TPG has had 100 shares of issued and outstanding common stock. (Id. ¶ 18). Elting has held 50 of those shares, Shawe has held 49 of those shares, and Shawe's mother has held the remaining share. (Id.). Elting and Shawe have never entered into any written agreements governing "their relationship as stockholders" or TPG's operations, such as "buy/sell agreement[s]." (Id. at 19). Christian has not received the promised conveyance and alleges that the sale of TPG or TPT is imminent. (Id. ¶¶ 32–33).

RULE 12(b)(6) STANDARD

To survive a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Legal conclusions are not entitled to the presumption of truth, and a court assessing the sufficiency of a complaint disregards them. Id. Instead, the Court examines only the well-pleaded factual allegations, if any, "and then determine[s] whether they plausibly give rise to an entitlement to relief." Id. at 679. A complaint must include non-conclusory factual allegations that "'nudge[]'" its claims "'across the line from conceivable to plausible.'" Id. at 680 (quoting Twombly, 550 U.S. at 570).

On such a motion to dismiss, the Court may consider "'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by reference,'" as well as documents that are integral to the complaint. Nicosia v. Amazon.com, Inc., 834 F.3d 220, 230 (2d Cir. 2016) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002)). A document is integral to a complaint if the complaint "relies heavily upon its terms and effect." Id. (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010)). "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Glob. Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208–09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION

    I.    <u>Amended Pleadings.</u>

In "special circumstances," the Court may disregard allegations in an amended complaint to the extent they contradict allegations in prior versions of the complaint. <u>Scarola Malone & Zubatov LLP v. Verizon Commc'ns, Inc.</u>, 14 cv 4518 (PKC), 2015 WL 3884211, at *5 (S.D.N.Y. June 24, 2015) (Castel, J.) (collecting cases), <u>aff'd sub nom.</u> <u>Scarola Malone & Zubatov LLP v. McCarthy, Burgess & Wolff</u>, 638 F. App'x 100 (2d Cir. 2016). Such circumstances arise when the amended complaint "blatantly" and "directly contradicts" the earlier statement of the facts to address arguments raised in a motion to dismiss. <u>Colliton v. Cravath, Swaine & Moore LLP</u>, 08 cv 400 (NRB), 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008) (Buchwald, J.), <u>aff'd sub nom.</u> <u>Colliton v. Cravath, Swain & Moore LLP</u>, 356 F. App'x 535 (2d Cir. 2009)). However, "in a typical case, a prior inconsistent pleading should not trump the Court's obligation under Rule 12(b)(6) to accept a complaint's allegations as true." <u>Palm Beach Strategic Income, LP v. Salzman</u>, 10 cv 261 (JS) (AKT), 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011) (Seybert, J.), <u>aff'd</u>, 457 F. App'x 40 (2d Cir. 2012); <u>see</u> <u>Barris v. Hamilton</u>, 96 cv 9541 (DAB), 1999 WL 311813, at *2 (S.D.N.Y. May 17, 1999) (Batts, J.) ("[T]he more usual and benevolent option is to accept the superseded pleadings but allow the factfinder to consider the earlier pleadings as admissions in due course.").

Here, the moving defendants submitted pre-motion letters outlining alleged defects in the Original Complaint. (Dkts. 18, 21). Christian advised the Court that he did not presently intend to amend the Original Complaint in response to the letters. (Dkts. 28, 30, 36). The Court uses the pre-motion letter process "to avoid [the] unnecessary expenditure" of resources "in briefing a motion to dismiss, only to have plaintiffs seek leave to file a further

amended complaint curing any deficiencies that were known and were curable at an earlier point in time." Footbridge Ltd. Tr. v. Countrywide Home Loans, Inc., 09 cv 4050 (PKC), 2009 WL 4278179, at *1 (S.D.N.Y. Nov. 23, 2009) (Castel, J.). TPG, TPT, and Elting filed their first motions to dismiss on October 16, 2017. (Dkts. 41, 44). Christian filed the Amended Complaint on November 30, 2017, following a delay related to a docketing error that the Court excused. (Dkts. 49–52, 54). But-for the error, the Amended Complaint would have complied with the time allotted by Rule 15, Fed. R. Civ. P, for amendments of right. TPG, TPT, and Elting filed the instant motions to dismiss the Amended Complaint thereafter. (Dkts. 55, 57).

Elting, TPG, and TPT together object to three deviations in the Amended Complaint as compared to the Original Complaint.[1] First, the Amended Complaint alleges that Christian's equity stake would come from "equal contributions from Shawe and Elting as the company's two principal shareholders," whereas the Original Complaint generically alleges that defendants would provide the stake without further specification of the source or composition of the stake. (E.g., Compl. ¶ 29; Am. Compl. ¶ 27). In so specifying, the Amended Complaint clarifies, rather than contradicts, the Original Complaint. There is thus an insufficient basis to disregard the allegation in the Amended Complaint in this respect.

Second, the Amended Complaint alleges that Shawe and Elting made a promise to convey the equity stake "*or* its cash equivalent of ten percent of [TPG's] shareholder value." (E.g., Am. Compl. ¶ 27 (emphasis added)). The Original Complaint, however, consistently describes a promise—not in the alternative—to convey an equity stake in TPG. (Compl. ¶¶ 1–2,

---

[1] TPG and TPT argue that Christian previously filed virtually identical complaints in other courts—now voluntarily dismissed or dismissed on procedural grounds—that contradict the Amended Complaint in the same respects as the Original Complaint. (TPT and TPG Mem. in Supp. (Dkt. 59) at 8–9, 12–13; Beaumont Decl. Exs. 33, 35). "A court may take judicial notice of a document filed in another court '. . . to establish the fact of such litigation and related filings.'" Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998). The Court takes judicial notice of such filings, and its ultimate conclusion reached here is not altered considering them.

18–21, 24, 26, 29, 32, 36).  But if Christian has a good faith factual basis for the new allegation, there is no principled reason why he may not include it in an amended pleading.  Ignoring the excused delay for the docketing error, Christian exercised an amendment of right under Rule 15, Fed. R. Civ. P., rather than seeking leave to amend beyond that time.  Special circumstances do not justify disregarding the amended pleading in this respect; the Court accepts it as true.

Finally, the Amended Complaint alleges that Elting and Shawe made the promise "on behalf of themselves individually *and* [d]efendants [TPG] and [TPT]," while the Original Complaint alleges that Elting and Shawe made the promise only "on behalf of [d]efendants [TPG] and [TPT]." (Compl. ¶¶ 24, 29; Am. Compl. ¶¶ 35, 40 (emphasis added)).  Because the amendment would have been one of right, the Court again accepts the amended pleading as true.

Whether the allegations of the Amended Complaint are a recent fabrication of Christian is not appropriately decided on a motion to dismiss.  The variances between the Original Complaint and the Amended Complaint likely will be admissible at the trial of the action.  Barris, 1999 WL 311813, at *2; Rule 801(d)(2)(A), Fed. R. Evid.

II.   Governing Law.

As a general matter, a district court sitting in diversity applies the choice-of-law rules of the state in which it sits.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  This Court applies New York law to determine which state's substantive law governs the claims in this case.  Wall v. CSX Transp., Inc., 471 F.3d 410, 415 (2d Cir. 2006).  The parties

dispute whether the Court should apply the law of Delaware or New York to the Amended Complaint to the extent the Amended Complaint alleges a promise to issue stock.[2]

"'[T]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'" Id. (quoting In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 223 (1993)). Actual conflicts arise when respective jurisdictions' laws provide different substantive rules that are "relevant" to the issue at hand and present a "significant *possible* effect on the outcome of the trial." Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 331 (2d Cir. 2005) (citations omitted). The effect need not be outcome dispositive. Id. If there is no such conflict, the Court applies the forum's law without further choice-of-law analysis. Wall, 471 F.3d at 422. Stated differently, the Court does not reach the question of whether the internal affairs doctrine or an interest analysis would counsel the application of another forum's law if there is no conflict. See id.

Delaware law requires that, to be enforceable, "commitments regarding the issuance of stock must be approved in writing by [that corporation's] board of directors." Grimes v. Alteon, Inc., 804 A.2d 256, 258, 260–61 (Del. 2002). The Grimes court found support for the writing and board approval requirements in a statutory provision providing that:

> Subject to any provisions in the certificate of incorporation, every corporation may create and issue . . . rights or options entitling the holders thereof to acquire from the corporation . . . shares of . . . any class or classes, such rights or options *to be evidenced by or in such instrument or instruments* as *shall be approved by the board* of directors.

---

[2] The parties raise a putative conflict in light of Grimes v. Alteon, 804 A.2d 256 (Del. 2002), which relates to commitments to issue shares, rather than commitments to transfer existing shares or to convey cash. The parties raised no other potential conflicts. They briefed all other issues under New York law or cited to New York law as parallel to that of Delaware. Such "implied consent to use [New York] law is sufficient to establish choice of law" on those issues. See Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton, 888 F.2d 239, 242 (2d Cir. 1989).

8 Del. C. § 157(a) (emphasis added). It construed this language the context of other provisions of Delaware law and concluded that such provisions together required board approval and a writing. Grimes, 804 A.2d at 260 (citing 8 Del. C. § 141(a) (board manages business and affairs of corporation); id. § 151(a) (certificate of incorporation governs board's ability to issue stock); id. §§ 152–53 (board determines appropriate consideration for issued shares); id. § 161 (board authorized to issue stock and take subscriptions subject to certificate of incorporation); id. § 166 (requiring subscription agreement to be a signed writing).

Christian's argument that Grimes is no longer good law based on the more recent passage of 8 Del. C. §§ 204–05 is unavailing. Sections 204 and 205 specify how a defective corporate act may become effective by way of board ratification or validation by the Delaware Court of Chancery; they do not alter what constitutes a defective corporate act in the first place. See 8 Del. C. §§ 204–05 (noting also that Delaware Court of Chancery has "exclusive jurisdiction" over section 205 proceedings). Sections 204 and 205 are further not the "exclusive means of ratifying or validating any [corporate] act or transaction." Id. § 204(i). Common law methods of ratification, including acquiescence, may therefore apply to validate voidable acts. Id.; see, e.g., Standard Roller Bearing Co. v. Hess-Bright Mfg. Co., 275 F. 916, 920 (3d Cir. 1921) (corporation may acquiesce in otherwise unenforceable agreement for its benefit through subsequent action). Voidable acts are acts that a corporation could accomplish lawfully if it were to proceed in the appropriate manner, but, as to the defective act at hand, it did not proceed appropriately. Nevins v. Bryan, 885 A.2d 233, 245 (Del. Ch.), aff'd, 884 A.2d 512 (Del. 2005). Void acts, by contrast, are illegal acts or acts beyond the corporation's authority. Id.

New York law contains provisions similar to 8 Del. C. § 157(a), which states:

Except as otherwise provided . . . in the certificate of incorporation, a corporation may create and issue . . . rights or options entitling the

- 9 -

> holders thereof to purchase from the corporation, upon such consideration, terms and conditions *as may be fixed by the board*, shares of any class or series . . . . The terms and conditions . . . *shall be set forth . . . in the instrument . . . evidencing such rights or options*.

N.Y. Bus. Corp. Law § 505(a)(1), (c) (emphasis added).  The New York statute specifies that the board "may" fix the terms of the rights or options, whereas the Delaware statute uses the mandatory "shall" with reference to board approval.  Id.; 8 Del. C. § 157 (emphasis added).  In spite of this difference and taking section 505 in context, the overall New York statutory scheme parallels that of Delaware, giving rise to a framework requiring board approval and a writing for commitments regarding stock issuance.  See N.Y. Bus. Corp. Law § 701 (board manages business and affairs of corporation); id. § 501 (certificate of incorporation governs corporation's ability to issue stock); id. § 504(a) (board determines appropriate consideration for issued shares); id. § 503(b) (requiring subscription agreement to be a signed writing).  New York does not have a statutory equivalent to 8 Del. C. §§ 204–05, but recognizes a corporation's ability to ratify or acquiesce in voidable acts.  See, e.g., First Nat. Bank v. Commercial Travellers' Home Ass'n, 108 A.D. 78, 82–83 (3d Dep't 1905), aff'd sub nom. First Nat. Bank v. Commercial Travelers' Home Ass'n, 185 N.Y. 575 (1906).

       To the extent the Amended Complaint alleges an oral promise to issue stock that is unapproved by the board, the laws of New York and Delaware hold such contract voidable but subject to the possibility of ratification.  The parties have not raised, nor can this Court identify, an actual conflict on ratification or otherwise presenting the requisite effect.  See Wall, 471 F.3d at 415.  The Court need not engage in further choice-of-law analysis and applies New York law.  See id. at 422.

III. <u>Motions to Dismiss for Failure to State a Claim.</u>

Before proceeding to the merits of each of the three claims embodied in the Amended Complaint, the Court addresses certain overarching issues raised by the parties. As noted, the Amended Complaint alleges that Elting and Shawe promised "on behalf of themselves individually and [d]efendants [TPG] and [TPT]" to convey a 10% equity stake in TPG or its cash equivalent, "with equal contributions from Shawe and Elting as the company's two principal shareholders." (Am. Compl. ¶¶ 27, 35). Facially, the defendants could fulfill such a promise in multiple ways, which the Court roughly categorizes as follows:

(1) TPG issues new stock, such that Christian receives 10% of the company, equally reducing the size of Shawe and Elting's ownership stakes.

(2) Shawe and Elting each transfer to Christian equal parts of the shares they already hold as shareholders of TPG, together amounting to a 10% equity stake.

(3) Defendants convey to Christian the cash equivalent of a 10% stake in TPG.

There is some merit to the position of certain defendants that they cannot be liable to the extent the Amended Complaint alleges a promise to be fulfilled in some but not all of these specific ways. If the Amended Complaint alleges solely a promise to issue TPG stock, TPT has no basis to cause TPG to issue stock. <u>See</u> N.Y. Bus. Corp. Law §§ 505(a)(1), (c) (permitting the corporation to create rights or options). TPT is merely TPG's subsidiary. (Am. Compl. ¶ 12). To the extent the alleged promise refers to the transfer of shares, TPT and TPG have no basis to compel TPG shareholders Shawe and Elting to transfer their shares, nor do they have any TPG shares of their own to convey. (<u>Id.</u> ¶¶ 12, 18). But the fact remains that the Amended Complaint does not allege a promise to be fulfilled exclusively in one of these ways. As alleged, the promise could be fulfilled by certain defendants in shares and certain others in cash. Should the

- 11 -

parties have proof of an intent that the promise was to be fulfilled through one of these means exclusively, that proof will appropriately be considered at a later stage of the proceedings.

The question remains as to whether the first method of fulfillment—the issuance of new stock—is viable as a matter of law in light of the writing and board approval requirements of New York law.  The Amended Complaint and Christian's briefing make clear that Christian claims the existence of a binding oral contract.  (Am. Compl. ¶ 19; Opp'n to Elting Mot. to Dismiss (Dkt. 61) at 16 ("Christian has sufficiently pled the existence of an oral contract.")).  Christian argues that it is impossible for him to know whether the board of TPG ever reduced the promise to a writing without discovery.  But simply asserting that a writing might have happened is not the same as pleading sufficient facts to make that assertion plausible.  To the contrary, the Amended Complaint affirmatively alleges that "Shawe and Elting *never* entered into any written agreements governing the operations of [TPG] . . . such as a buy/sell agreement."  (Am. Compl. ¶ 19 (emphasis added)).  He alleges that the promise was made on "multiple occasions" at annual meetings of senior management, but none more recent or more specific than the 2014 promise at the center of the Amended Complaint.  (Id. ¶ 23).

But an act within the corporation's authority that is effectuated in an unenforceable manner, is voidable, rather than void.  See N.Y. Bus. Corp. Law § 505(a)(1), (c) (corporation has authority to create rights to receive issued stock); First Nat. Bank v. Commercial Travellers' Home Ass'n, 108 A.D. 78, 82–83 (3d Dep't 1905), aff'd sub nom. First Nat. Bank v. Commercial Travelers' Home Ass'n, 185 N.Y. 575 (1906) (board that fails to disaffirm known unauthorized act of agent in reasonable time acquiesces in and ratifies such act). Even though Christian alleges a voidable contract, he pleads sufficient facts to state a claim based on the acquiescence of TPG in the known, voidable act of its officers that allegedly created

a commitment to issue stock. See First Nat. Bank, 108 A.D. at 82–83. Shawe and Elting constitute the co-CEOs and entire board of TPG, and the Amended Complaint plausibly alleges facts suggesting that TPG and TPT, as well as Shawe and Elting personally, accepted benefits under the arrangement for nearly two years. (Am. Compl. ¶¶ 15, 30). The Court thus declines to dismiss the Amended Complaint to the extent it alleges a promise to issue stock.

    a. Contract Claim.

Under New York law, a complaint stating a breach of contact claim must allege (1) the existence of a contract; (2) performance of the contract by one party; (3) breach of the contract by another party; and (4) damages. Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996). The movants challenge the existence of a contract based on the indefiniteness of the promise, as an "agreement to agree," and based on the failure to provide adequate consideration.

A contract fails for indefiniteness if it inadequately specifies the material terms of the bargain. See Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp., 74 N.Y.2d 475, 482 (1989). However, "virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties." Id. at 483. In the case of a promise for equity in a business, the promise must convey the nature of the obligation, including the amount, the timing, and the source of payment. See, e.g., Scarpinato v. 1770 Inn, LLC, 13 cv 0955 (JS) (SIL), 2015 WL 4751656, at *4 (E.D.N.Y. Aug. 11, 2015) (Seybert, J.) (holding indefinite oral promise for 10% of company where promise did not specify if 10% was of equity or assets); Hecht v. Helmsley-Spear, Inc., 65 A.D.3d 951, 951–52 (1st Dep't 2009) (holding indefinite oral promise lacking terms as to amount, form, and timing); Glanzer v. Keilin & Bloom LLC, 281 A.D.2d 371, 371–72 (1st Dep't 2001) (holding indefinite oral promise for "equity interest"). Additionally, "a price term is not necessarily

indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula," because it may be ascertainable with reference to external evidence. Cobble Hill Nursing Home, Inc., 74 N.Y.2d at 483.

A related concept is the "agreement to agree," which is an unenforceable contract by virtue of a missing material term or terms "as if the parties had left blanks in the writing, to be filled in later when their minds should meet." May Metro. Corp. v. May Oil Burner Corp., 290 N.Y. 260, 264 (1943). "But a contract is not necessarily lacking in all effect merely because it expresses the idea that something is left to future agreement." Id. "Even with some indefinite terms, . . . a commitment is . . . not a mere 'agreement to agree,' where a method to determine the nature of promised equity participation is available." Canet v. Gooch Ware Travelstead, 917 F. Supp. 969, 990 (E.D.N.Y. 1996) (Trager, J.).

Finally, a contract requires adequate consideration, which is a bargained-for advantage to the promisee or disadvantage to the promisor. Startech, Inc. v. VSA Arts, 126 F. Supp. 2d 234, 236–37 (S.D.N.Y. 2000) (McMahon, J.). While ordinarily a question of fact, "when it is clear from the face of the pleading and the terms of the contract that a promise is gratuitous, the complaint will be dismissed." Id. at 236.

Christian's breach of contract claim does not fail for indefiniteness. The alleged promise conveyed: (i) the nature of the obligation: a 10% equity stake or its cash equivalent constituting 10% of shareholder value; (ii) the timing of the promise: within a matter of months, (ii) and the source of the payments: with equal contributions from Elting and Shawe. (Am. Compl. ¶ 27). Terms such as how any equity stake would vest or how "shareholder value" would be calculated for the purposes of a cash conveyance may be discernable from proof at trial or implied in law. The alleged contract is also not an unenforceable agreement to agree because,

to the extent materials terms remain open, they again may be ascertainable. The contract claim also does not fail for inadequate consideration. Christian claims that he took on responsibilities that would have fallen to co-CEOs Shawe and Elting had they not been burdened by litigation. (Id. ¶ 30). The performance of these responsibilities renders the promise not gratuitous.

    b. <u>Promissory Estoppel Claim.</u>

"[P]romissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." <u>Kaye v. Grossman</u>, 202 F.3d 611, 615 (2d Cir. 2000). As a threshold matter, courts in this Circuit disagree regarding the extent to which New York law permits promissory estoppel claims in the employment context. <u>Compare</u> <u>Joshi v. Trustees of Columbia Univ. in City of New York</u>, 17 cv 4112 (JGK), 2018 WL 2417846, at *9 (S.D.N.Y. May 29, 2018) (Koeltl, J.) (employment context does not categorically bar promissory estoppel claims under New York law) <u>and</u> <u>Roelcke v. Zip Aviation, LCC</u>, 15 cv 6284 (DAB), 2018 WL 1792374, at *12 (S.D.N.Y. Mar. 26, 2018) (Batts, J.) (same) <u>with</u> <u>Blodgett v. Siemens Indus., Inc.</u>, 13 cv 3194 (JMA)(AKT), 2018 WL 385477, at *5 (E.D.N.Y. Jan. 11, 2018) (New York law does not recognize promissory estoppel in the employment context) <u>and</u> <u>Wittig v. Mount Sinai Med. Ctr., Inc.</u>, 14 cv 5808 (AKH), 2014 WL 7234612, at *2 (S.D.N.Y. Dec. 18, 2014) (Hellerstein, J.) <u>and</u> <u>Rojo v. Deutsche Bank</u>, 06 cv 13574 (HB), 2010 WL 2560077, at *7 (S.D.N.Y. June 23, 2010) (Baer, J.), <u>aff'd</u>, 487 F. App'x 586 (2d Cir. 2012) (same). While courts applying the bar have generally embraced the broad terms that the cause of action is not permitted "in the employment context," <u>see, e.g.</u>, <u>Blodgett</u>, 2018 WL 385477 at *5, they have generally applied the bar when no promise arises that is separate from an employment relationship, <u>see, e.g.</u>, <u>Roelcke</u>, 2018 WL 1792374, at *12; <u>Rojo</u>, 2010 WL 2560077, at *7

(noting that promise that "'surround[ed] an employment relationship'" is barred (quoting Pancza v. Remco Baby, Inc., 761 F. Supp. 1164, 1172 (D.N.J. 1991)); Wittig, 2014 WL 7234612, at *1–2 (barring claim where former employee claimed right to payment for tasks performed prior to termination); Dalton v. Union Bank of Switzerland, 134 A.D.2d 174, 176 (1st Dep't 1987) (barring claim based on an employee's foregoing other possible employment based on a promise of new employment with certain benefits). This Court concludes that promissory estoppel is not absolutely foreclosed in all circumstances that arise in the employment context.

Here, Christian alleges that he was performing duties that would normally fall to the co-CEOs who were unavailable to perform them. (Am. Compl. ¶¶ 15, 30). His claim is thus not coextensive with his employment relationship, because he was employed as TPT's Executive Vice President of Global Sales & Marketing and Chief Sales Officer. (Id. ¶ 29). Based on the same allegations of performing additional job responsibilities, the Court cannot dismiss the promissory estoppel claim based on a failure to allege an injury. His salary covers those jobs he was retained to perform, and not alleged additional duties. TPT and TPG further argue that no damage can flow from Christian's abstention from participating in the phantom stock program in order to prioritize the well-being of the company. That specific claim remains viable because Christian plausibly alleged an opportunity to cash out and a resulting detriment. (Am. Compl. ¶ 31). Should TPT and TPG wish to dispute such claim based on the details of the phantom stock program, they may do so when such facts are properly before the Court.

There is an open question of whether an "unconscionable injury" is a required element of a promissory estoppel claim where the claim is not invoked to estop the application of the Statute of Frauds. See generally Joshi, 2018 WL 2417846, at *8–9. Setting such inquiry aside, the Court nonetheless could not dismiss the claim on the basis that Christian's alleged

injuries are not of an unconscionable nature on this motion. Similarly, whether Christian's reliance is reasonable is not appropriate for determination on a motion to dismiss because Christian plausibly alleged such reliance in describing the detriment in, for example, declining to seek additional pay for the CEO duties performed. (Am. Compl. ¶ 42). For substantially the same reasons stated in the context of the contract claim, the promissory estoppel claim does not fail for indefiniteness. See Hughes v. Standard Chartered Bank, PLC, 09 cv 4595 (PKC), 2010 WL 1644949, at *7 (S.D.N.Y. Apr. 14, 2010) (Castel, J.) (requiring "clear and unambiguous" promise to state promissory estoppel claim).

    c.   Unjust Enrichment Claim.

A plaintiff bringing an unjust enrichment claim under New York law must establish "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000). A former employee alleging unjust enrichment by his former employers may state a claim by alleging that the employee "rendered . . . services to defendants that were beyond the scope of his [or her] duties." Hughes, 2010 WL 1644949, at *7–8.

As noted, Christian alleges that he rendered services beyond those called for in his job description. (Am. Compl. ¶¶ 15, 30–31). The fact that he received a salary for the job he was hired to perform does not foreclose his unjust enrichment claim on the basis of the original services. TPT and TPG further argue that any enrichment exclusively inured to defendants Elting and Shawe, and Elting argues the same as to TPT and TPG, but Christian has pled plausible facts that each defendant—the company directly employing him, his employer's holding company, and the primary shareholders and co-CEOs of the holding company personally—benefited from his performance of duties while Elting and Shawe were embroiled in

litigation. (E.g., id. ¶ 30 (describing employee and client retention); id. ¶ 35 (alleging Shawe and Elting made promise individually)). For the same reasons reviewed in the promissory estoppel context, Christian's claim that he was damaged or impoverished does not fail as a matter of law.

CONCLUSION

This case may look very different at the summary judgment stage or at trial. Because the allegations of the Amended Complaint that are assumed to be true for the purposes of this motion state otherwise plausible claims, the Rule 12(b)(6), Fed. R. Civ. P, motions to dismiss are DENIED. (Dkts. 55, 57).

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
September 24, 2018